**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SAUL SANCHEZ GODINEZ,** | ) | |
| **ULISES SANCHEZ FIERRO, and** | ) | |
| **the ESTATE OF EUSEVIO GARCIA,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No.  22 C 1400** |
| | ) | |
| **CLASSIC REALTY GROUP-IL, INC.** | ) | **Judge Rebecca R. Pallmeyer** |
| **d/b/a CLASSIC REALTY GROUP, INC. and** | ) | |
| **CATTY SALGADO,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Saul Sanchez Godinez, Ulises Sanchez Fierro, and the Estate of Eusevio Garcia sued Defendants Catty L. Salgado and Classic Realty Group, Inc. for violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. ("FLSA") and Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq*. ("IMWL").  Plaintiffs now seek summary judgment on both liability and damages as against Salgado.  They contend they were Salgado's employees, and that because she failed to keep accurate records of their work, she bears the burden of disproving the extent of their claims for compensation.  Salgado, who is unrepresented,[1] has responded to the motion with three one-page handwritten letters accompanied by notes, photographs, and photocopies.  Those submissions do not conform to the letter of Local Rule 56.1, but Salgado's pro se submissions, construed liberally, create disputes of material fact concerning Plaintiffs' employment status.  Plaintiffs' motion for summary judgment is therefore denied.

---

[1]     Salgado submitted a letter on October 12, 2023 stating that she had retained counsel to represent her in this matter [60].  As of the date of this order, however, no attorney has filed an appearance on her behalf, and the court thus deems her unrepresented for purposes of Plaintiffs' motion.

## BACKGROUND

Plaintiffs filed this action in March 2022, alleging that Defendant Catty Salgado underpaid them for work in violation of the FLSA and IMWL.  (Pls.' Am. Mem. of Law Supp. Mot. Summ. J. [hereinafter "Pls.' Mem."] [52] at 8–9.)  In January 2023, Plaintiff Garcia passed away and was replaced by his estate [31].

Plaintiffs assert that Salgado is a realtor who hired them to renovate properties she rents and sells.  (Pls.' Local Rule 56.1 Statement of Facts [52-3] [hereinafter "Pls.' LR 56.1"] ¶ 1.)  They contend, further, that Salgado is also a manager and agent of Defendant Classic Realty Group-IL, Inc., doing business as Classic Realty Group, Inc.[2]  (Compl. [1] at 1.)  Salgado was initially represented by counsel in this action, who filed an answer to Plaintiffs' complaint on her behalf in August 2022 [19].  In that answer, Salgado asserted several affirmative defenses, including that she lacked an employer-employee relationship with Plaintiffs as required for FLSA and IMWL liability.  (*Id.* at 19.)  In January 2023, however, Salgado's counsel withdrew due to differences that made representation "unreasonably difficult," and she has since proceeded pro se.  (Kenneth A. Henry's Mot. Withdraw [32] ¶ 4.)  The parties scheduled a settlement conference in February 2023,  but this conference was postponed [35] and ultimately cancelled [44] after Salgado failed to retain counsel or respond to the court's inquiries.

I.      **Plaintiffs' Motion for Summary Judgment**

In September 2023, Plaintiffs moved for summary judgment against Defendant Salgado alone (not Defendant Classic Realty Group) on their FLSA and IMWL claims.  (*See* [50], [51], [52].)  In their motion, Plaintiffs argued that they had the status of employees and are entitled to FLSA and IMWL protections because (1) Salgado controlled their schedule, wages, and tasks; (2) Plaintiffs did not control their own businesses but instead performed "regular menial tasks" for

---

[2]      Plaintiffs also alleged in their complaint that Salgado was a manager and agent of Chicagoland Brokers, Inc., which was initially named as an additional party to this case. (Compl. ¶ 4).  Chicagoland Brokers was dismissed without prejudice [46] after Plaintiffs filed a joint stipulation of dismissal [45] without further explanation.

Salgado's realty business; (3) Salgado dictated Plaintiffs' rate and method of payment; and (4) Salgado hired and could fire Plaintiffs at any time. (Pls.' Mem. at 9–10; *see* Pls.' LR 56.1 ¶¶ 7–14.) In support of these claims, Plaintiffs submitted affidavits from Plaintiff Godinez (speaking on behalf of himself and Plaintiff Garcia) and Plaintiff Fierro. (*See* Ex. D to Pls.' Mem. [52-4] [hereinafter "Godinez Aff."]; Ex. E to Pls.' Mem. [52-5] [hereinafter "Fierro Aff."].) Both affidavits include attached exhibits setting forth Plaintiffs' calculations of their unpaid wages and interest.

According to Plaintiffs' affidavits, Salgado hired Godinez in March 2019, Fierro in March 2019, and Garcia in November 2021. (Godinez Aff. ¶ 5; Fierro Aff. ¶ 4.) Godinez worked on Salgado's properties from March 2019 to January 2022. (Godinez Aff. ¶ 5.) Garcia worked alongside Godinez from November 2021 to January 2022. (*Id.*) Their responsibilities "included demolition, carpentry, dryboarding, plaster taping, painting, and cleaning" for Defendant's properties. (*Id.*) Plaintiff Fierro completed similar work from March 2019 to January 2022. (Fierro Aff. ¶ 4.)

Plaintiffs attest that Salgado exercised significant supervision over their work. For example, Godinez and Fierro state that Salgado "set [their] schedules, even on holidays, and [they] came to work when she told [them] to do so"; that she "told [them] what work was to be done" and "was [their] supervisor [who] directed [their] day-to-day work"; that they "were not hired on a project-by-project basis"; that while they were working on Salgado's projects, they "did not have any other jobs"; and that Salgado hired and could fire them at any time. (Godinez Aff. ¶¶ 9–15; Fierro Aff. ¶¶ 9–14.)

Plaintiff Godinez asserts that he worked forty-three hours per week from March 2019 through January 2022, and was to be paid $1,000.00 weekly, but never received overtime compensation and did not receive payment at all from August 2021 to January 2022. (Godinez Aff. ¶¶ 19–21.) As a result, Godinez states he is owed $30,236.47 in unpaid wages and overtime compensation. (*Id.* ¶ 25; Pls.' Mem. at 11.)

Godinez makes similar statements on behalf of the estate of Garcia: that Garcia worked sixty-five hours per week and was to be paid $1,500.00 weekly, but never received overtime compensation and did not receive payment from December 2021 to January 2022. (Garcia Aff ¶¶ 29–31.) Garcia's estate asserts he is owed $15,456.90 in unpaid wages and overtime compensation. (*Id.* ¶ 35; Pls.' Mem. at 11.)

Plaintiff Fierro states that he worked fifty to sixty hours per week at an agreed rate of $15 per hour, but never received overtime compensation and received no compensation at all from October 2021 to January 2022. (Fierro Aff. ¶¶ 20–21.) Fierro states he is owed $25,275.00 in unpaid wages and overtime compensation. (*Id.* ¶ 24; Pls.' Mem. at 11.)

Plaintiffs claim, further, that they are entitled to additional damages under the FLSA and IMWL. (Pls.' Mem. at 9.) Both statutes permit Plaintiffs to recover attorneys' fees and costs, and the IMWL also allows Plaintiffs to collect treble damages for unpaid wages and five percent monthly interest. (*Id.*) In total, Plaintiffs collectively claim $70,968.37 in unpaid wages, $141,936.74 in liquidated damages, and $76,403.35 in interest, plus an unspecified amount of fees and costs for which they seek the court's leave to file a separate petition. (*Id.* at 11.)

## II. Defendant Salgado's Three Letters and Accompanying Documents

Defendant Salgado did not respond to Plaintiffs' summary judgment motion in the manner directed by Local Rule 56.1, despite receiving notice and instructions from Plaintiffs' counsel as required by Local Rule 56.2.[3] Instead, Salgado submitted three handwritten letters accompanied by several attachments. (*See* [54], [55], [56].)

The first letter details Defendant Salgado's interactions with Plaintiff Garcia. (*See* [54] [hereinafter "First Letter"] at 1.) Her description reads:

---

[3] *See* Exs. F, G, H to Pls.' Mem. [52-6, 52-7, 52-8] (copies of Local Rule 56.1, Rule 56, and Local Rule 56.2 included with Plaintiffs' summary judgment papers); Certificate of Service [53]; Minute Entry [59] ("As required by this [C]ourt's Local Rule 56.2, Plaintiff[s' counsel] advised Ms. Salgado of the requirements for submission of a response to a motion for summary judgment.").

> [Garcia] was paid [per] job[.] I wr[o]te down a list of the jobs that he did. . . . [Godinez] recommended him . . . [Garcia] always told me how much he charged before[] he start[ed] any job. He [had] multiple jobs and some[times] he told me that he can't help me[] because he [was] busy. . . . He [would] do one or max two jobs every month and he usually [took] 2 [to] 3 days to finish any job because he [did them] with more people[,] usually 2 to 4 [people] with him. I have all [the] texts that [Garcia] sent to me and pictures of the jobs he perform[ed]. . . . I pa[id him] at the same time [as] various [other] workers because [Godinez] do[es] paint and drywall, . . . I pa[id] a carpenter at the same time[,] . . . [and Garcia] did windows[,] roof[ing,] and concrete, and different people [did] plumb[ing.]

(*Id.*) Attachments to this letter include photocopies of checks and a handwritten list of projects that Garcia worked on, the dates of those projects, and the amounts Salgado paid him for each project. (*Id.* at 2–11.) There are nine jobs listed: fixing a property's roof and gutters (1) on April 22, 2021 for $2,000; completing window-related projects (2) on April 23, 2021 for $1,000, (3) on May 26, 2021 for $2,750, and (4) on July 9, 2021 for $3,000; installing siding and gutters on September 18, 2021 at two different properties for (5) $2,400 and (6) $1,050; fixing a roof and balcony (7) on November 30, 2021 for $4,500; completing basement concrete work (8) on December 17, 2021 for $3,000; and completing demolition work (9) on January 12, 2021 for $3,000.[4] (*Id.* at 2.)

The second letter details Defendant Salgado's exchanges with Plaintiffs Godinez and Fierro. (*See* [55] [hereinafter "Second Letter"] at 1.) The letter states:

> This is a copy of the text that I sent to [Godinez,] show[ing] the form of payment that I used with him. Here I disclos[ed] the work he perform[ed] and how much he charged for it, after I pa[id] him for some weeks, we find out how much more I owed him, or some[times] I pa[id] him more[,] but in this case I ended [up] owing him[.] This was the only time that I sent [confirmation] by text[.] That[']s why I have this proof. [Godinez] was the only contact I [had], I never communicated[] with [Fierro], he was [Godinez's] assist[a]nt or helper. I never had his phone number. . . . Another thing that I want to say is that I never control[led] [Godinez's] time of work, in no way, I was not there when they start[ed] working[,] and I was not there when they finish[ed] in the afternoon. I did not have any time control machine[ry either b]ecause I pa[id] them [per] job done. And he sent me pictures when he finish[ed the job], or when he [had] questions.

---

4       All other dates in Salgado's list are in chronological order, so it is possible that this date was incorrectly written as "January 12, 2021" rather than "January 12, 2022."

(*Id.*)  The attachments to this second letter include photographs of text messages from August 2020 that contain photos of checks and cash withdrawal receipts for payments dated between April and July 2020, as well as another handwritten list of Godinez's projects, their dates, and how much she paid him per project.  (*Id.* at 2–10.)  There are fourteen jobs listed: painting the inside and outside of a property (1) on November 8, 2020 for $4,000; completing a fence-related project (2) on November 16, 2020 for $1,000; repairs in two apartments (3) on November 26, 2020 for $3,500; completing a basement-related project (4) on December 18, 2020 for $2,500; completing an unspecified project (5) on February 8, 2021 for $6,500; completing a trash-related project (6) on March 7, 2021 for $600; completing three projects at three different properties on January 28, 2021 for (7) $370, (8) $370, and (9) $1,200; completing a miscellaneous project (10) sometime in April 2021 for $4,500; and completing four projects at one property on July 27, 2021 for (11) $7,500, (12) $3,000, (13) $4,000, and (14) $600.  (*Id.* at 9–10.)

The third letter introduces another homeowner, Graciela Ramos, who—Salgado alleges— hired Plaintiff Godinez on a project-by-project basis at the same time he was completing work for her business.  (*See* [56] [hereinafter "Third Letter"] at 1.)  Salgado's letter reads:

> I'm presenting proof that [Godinez] did not work just for m[e], this is one person of others that he work[ed] for in this case. Graciela Ramos wr[o]te a letter with dates that he work[ed] for her, I attached her ID too and since she pa[id] cash, because she said that [Godinez] ask[ed] for cash, I'm enclosing[] her credit and debit cards that she used to pay material for the job[s]. I'm attaching her bank statements[] and [her] home depot account to confirm that she pa[id] for material[s.] The r[eason] I was able to collect all [of this] information is because I sold this property (that [Godinez] fix[ed]) to Graciela, I recommend[ed] him to her, but she d[id all of] the nego[ti]ation with him and because [Godinez bought] all the material through [her] account [at] Home Depot.

(*Id.*)  The letter further states that Salgado is aware of at least two other individuals for whom Godinez has worked, and asserts that those individuals "will be willing to do declaration too if is needed."  (*Id.*)  The attachments following Salgado's letter include: a photocopy of Graciela Ramos's driver's license; a printout of a property listing; a signed, notarized letter written in

6

Spanish by Graciela Ramos; photographs of Visa cards; printouts of bank statements; and records of Home Depot transactions accompanied by handwritten notes. (*Id.* at 2–18.)

## DISCUSSION

**I.      Summary Judgment**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A movant under Rule 56 bears the burden of showing that they are entitled to judgment as a matter of law, even if the nonmovant has failed to meaningfully respond or has failed to comply with Local Rule 56.1. *Perez v. Super Maid, LLC*, 55 F. Supp. 3d 1065, 1074 (N.D. Ill. 2014) (citing *Keeton v. Morningstar*, 667 F.3d 877, 884 (7th Cir. 2012)). When determining whether a fact is genuinely disputed, courts draw "all justifiable inferences" in favor of the nonmoving party—in this case, Defendant Salgado. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

As noted, Salgado did not comply with Local Rule 56.1 despite receiving warning notices. Ample caselaw supports strict enforcement of these rules. *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 787 (7th Cir. 2019); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). The Supreme Court has held, however, that pro se submissions should be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). As it would in a case where a plaintiff is proceeding pro se, this court has discretion to interpret Defendant's submissions (three letters and accompanying documents) liberally as a response to Plaintiffs' statement of facts. *See Gray v. Hardy*, 826 F.3d 1000, 1004–05 (7th Cir. 2016) (approving of this court's decision to "overlook [pro se litigant's] noncompliance with Local Rule 56.1 and construe[] the limited evidentiary materials he . . . submitted in the light most favorable to him" (citations and internal quotation marks omitted)). The court will therefore consider factual statements in Salgado's submissions to the extent she would be able to present admissible evidence that would support those factual statements. *See* FED. R. CIV. P. 56(c)(4).

7

## II.    The Fair Labor Standards Act

Congress enacted the FLSA in 1938 to protect workers "from the evil of overwork as well as underpay."  *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (citation and internal quotation marks omitted).  The FLSA has two central parts—setting a minimum wage and requiring compensation for overtime work.  *See* 29 U.S.C. §§ 206, 207.  The federal minimum wage, for now, is $7.25 per hour.  *Id.* § 206(a)(1)(C).  The statute provides, further, that employers must pay workers in any "enterprise engaged in commerce"[5] at one and one-half times their regular pay rate for any hours worked in excess of forty per week.[6]  *Id.* § 207(a)(1).

Defendant Salgado is only potentially liable under the FLSA, however, if an employer-employee relationship existed between her and the Plaintiffs; otherwise, Plaintiffs would be classified as "independent contractors" exempt from FLSA coverage.  29 C.F.R. § 795.105(a).  The terms "employee" and "employer" are not defined with particularity in the statute, although "[t]he Supreme Court has instructed the courts to construe the[m] . . . expansively under the FLSA."  *Simpkins v. DuPage Hous. Auth.*, 893 F.3d 962, 964 (7th Cir. 2018) (citation omitted).  In doing so, courts apply an "economic reality" test to determine a plaintiff's employment status,

---

[5]      To qualify as a covered "enterprise," a business must (1) have employees who are "engaged in commerce or in the production of goods for commerce," or who "handl[e], sell[], or otherwise work[] on goods or materials . . . moved in or produced for commerce"; and (2) have "annual gross volume of sales made or business done [of] not less than $500,000."  29 U.S.C. § 203(s)(1)(A).  Here, Plaintiffs allege "[u]pon information and belief" that Salgado's business meets the $500,000 threshold, and that they "used tools such as hammers, nails, wheelbarrows, drywall, plaster, and other tools of carpentry that had been shipped from other states in interstate commerce."  (Pls.' LR 56.1 ¶¶ 4, 5.)  Defendant Salgado does not challenge these aspects of Plaintiffs' claims in her submissions, and the court will accept them as satisfied for purposes of summary judgment.  *See Radulescu v. Moldowan*, 845 F. Supp. 1260, 1264–65 (N.D. Ill. 1994) (finding "interstate commerce" requirement satisfied where plaintiff janitors "handled and used goods that had moved in interstate commerce").

[6]      Section 13(a)(1) exempts from FLSA coverage "any employee employed in a bona fide executive, administrative, or professional capacity . . . ."  29 U.S.C. § 213(a)(1).  But those exemptions "do not apply to manual laborers or other 'blue collar' workers who perform work involving repetitive operations with their hands, physical skill and energy," such as Plaintiffs.  29 C.F.R. § 541.3(a).

scrutinizing the potential employee's "economic dependence" on the potential employer. *Id.* §§ 795.105(b), .110; *Sec'y of Lab. v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987). The Seventh Circuit applies a six-factor, totality-of-the-circumstances test to determine an individual's economic dependence on a potential employer. *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 665 (7th Cir. 2022) (citing *Lauritzen*, 835 F.2d at 1535). The six criteria are:

> 1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
> 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> 3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
> 4) whether the service rendered requires a special skill;
> 5) the degree of permanency and duration of the working relationship; [and]
> 6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Id.*[7] When courts examine these factors in their totality, "greater dependence weigh[s] in favor of an employer-employee relationship." *Id*.

In this case, summary judgment hinges on this court's analysis of the Seventh Circuit's "economic reality" test. Although the determination of an employee's covered status under the FLSA is ultimately a question of law, the material facts underlying this determination may be disputed, precluding summary judgment. *Simpkins*, 893 F.3d at 965. Here, the parties' submissions create such a dispute, as explained below.

---

[7]     In their September 2023 motion for summary judgment, Plaintiffs cite a five-factor version of this test from the Fifth Circuit that eliminates the "integral part of the alleged employer's business" factor. (*See* Pls.' Mem. at 4 (citing *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008).) It is not entirely clear why. The Department of Labor promulgated a different five-factor test in 2021 that combined several factors and placed greater weight on some than others, but this Rule has been rescinded. *See Independent Contractor Status Under the Fair Labor Standards Act: Final Rule*, 86 Fed. Reg. 1,168 (Jan. 7, 2021); *Employee or Independent Contractor Classification Under the Fair Labor Standards Act: Final Rule*, 89 Fed. Reg. 1,638 (Jan. 10, 2024). The court will apply the Seventh Circuit's traditional six-factor, totality-of-the-circumstances test in the absence of any clear authority to the contrary. *See Wenckaitis v. Specialty Contractors, Inc.*, No. 20 C 3743, 2023 WL 4472567, at *4 (N.D. Ill. July 11, 2023) (citing *Brandt*, 43 F.4th at 665).

### A. Plaintiffs' Status as "Employees" Under the FLSA

Plaintiffs all argue that they had an employer-employee relationship with Salgado. As noted, they rely on four factual assertions to support this argument:

> (1) Plaintiffs' "schedule, wage, and tasks were all controlled and supervised by Defendant";
> (2) "Plaintiffs did not operate their own business – they performed regular menial tasks at a real estate broker company – demolition, carpentry, dry boarding, plaster taping, painting, cleaning of properties to be rented or sold, and even helping with moving new residents and owners";
> (3) "Defendant controlled the rate and method of payment to Plaintiffs"—namely, "Defendant paid Plaintiffs a fixed rate"; and
> (4) "Defendant hired Plaintiffs," and "could have fired Plaintiffs at any time."

(Pls.' Mem. at 9–10.) This court compares these contentions, and Plaintiffs' summary judgment submissions, to the statements in Defendant Salgado's letters, considered in the light most favorable to Salgado. As set forth below, Salgado's letters meaningfully contradict Plaintiffs' assertions.

First, Salgado disputes Plaintiffs' statements that she uniformly "controlled and supervised" their "schedule, wage, and tasks." Under *Lauritzen*'s first factor, "[e]vidence displaying an employer's dominance over the manner and method of how work is performed suggests control by an employer." *Perez*, 55 F. Supp. 3d at 1076 (citation and internal quotation marks omitted). Under the second factor, a worker's "opportunity to increase profits through managerial discretion"—for example, by setting their own rates or hours—cuts against employee status. *Id.* at 1077 (citation omitted). Here, Salgado's letters state that she would offer Garcia projects, that he exercised the ability to reject Salgado's offers, and that he would inform her how much he would charge when he accepted a project. (First Letter at 1.) Salgado's description of Garcia's work process suggests that Garcia exercised broad autonomy in completing these projects, including by coordinating help from other unidentified workers. (*Id.* ("He do one or max two jobs every month and he usually take 2 o[r] 3 days to finish any job because he do it with more people usually 2 to 4 persons with him.").) With respect to Godinez, Salgado asserts that she "never control[led] [his] time of work," was not onsite when he or the other Plaintiffs started

10

and finished work for the day, and did not supervise their renovation work beyond answering questions from Godinez via text message. (Second Letter at 1.) Additionally, Salgado states she did not directly communicate with Fierro at all. (*Id.*) Instead, she asserts that Fierro was Godinez's "assistant or helper," and not her direct employee whose time, wage, and tasks she controlled. (*Id.*) Last, Salgado asserts that Godinez worked for at least one other homeowner— Graciela Ramos. (Third Letter at 1.) She specifically states that she "recom[m]end[ed] [Godinez]" to Ramos after selling her a property in need of renovations, and that Ramos had "do[ne] the nego[t]iation with him." (*Id.*) If Godinez did in fact negotiate independently with Ramos, this calls into question whether Salgado exclusively managed his time, wages, and tasks as Plaintiffs allege in their summary judgment motion. Taken in the light most favorable to Salgado, these facts suggest that Plaintiffs may have had significant discretion in both negotiating and performing work for her business.

Second, Salgado's letters dispute Plaintiffs' assertions that they performed "regular menial tasks" for her real estate company. In addition to *Lauritzen*'s second factor concerning an employee's ability to exercise managerial discretion, the test's fifth factor considers the "degree of permanency and duration of the working relationship," both of which are relevant to determining the worker's level of economic dependence on the employer. *Lauritzen*, 835 F.2d at 1535–36. As stated, the letters claim that Garcia turned down projects when he was busy, and that Godinez concurrently worked for at least one other homeowner. (First Letter at 1; Third Letter at 1.) Drawing inferences in Salgado's favor, Garcia's ability to reject projects and Godinez's outside employment are both indicative of irregular, unexclusive employment more in keeping with the role of an independent contractor than that of a regular employee. *See Mendiola v. Howley*, No. 18 C 8536, 2021 WL 3033613, at *6–7 (N.D. Ill. July 19, 2021) (denying summary judgment where there was "a material fact dispute over whether Plaintiffs were free to work for other companies while doing work for [defendants]"); *Jaworski v. Master Hand Contractors, Inc.*, No. 09 C 7255, 2013 WL 1283534, at *4 (N.D. Ill. Mar. 27, 2013) ("Plainly, the plaintiffs had some

opportunity and ability to work for other firms, and that fact strongly suggests that the plaintiffs did have the opportunity to increase their revenues (or decrease them, either by not pursuing or retaining other work)"); *cf. Harris v. Skokie Maid & Cleaning Serv., Ltd.*, No. 11 C 8688, 2013 WL 3506149, at *9 (N.D. Ill. July 11, 2013) (finding that "permanency" factor weighed in plaintiffs' favor where they signed exclusivity contracts precluding them from working for other competing services in the surrounding area).

Third, the facts presented in Defendant Salgado's letters dispute Plaintiffs' statements that she paid them a fixed hourly rate. *See Perez*, 55 F. Supp. 3d at 1077 (under *Lauritzen*'s second factor, "[s]trict prearranged pay scales" are indicative of employment status since they "eliminate the opportunity for those workers to realize increased profits by adjusting their own performance"). Most of the checks provided by Salgado are in round numbers. (*See* First Letter at 2–11; Second Letter at 2–10.) This suggests that Salgado paid per discrete project instead of using a fixed rate for total hours worked, militating against a finding of an employer-employee relationship. *See, e.g.*, *Reyes v. Remington Hybrid Seed Co., Inc.*, 495 F.3d 403, 408 (7th Cir. 2007) (describing temporary relationship involving "a distinct activity—for example, plumbing repairs—conducted by an independent contractor who appears, does a discrete job, and leaves again"); *cf. Mendiola*, 2021 WL 3033613, at *5 ("Because Plaintiffs worked a set number of hours at a fixed hourly rate— as opposed to a flat rate per job—they had no opportunity to earn additional compensation by performing their work more efficiently."). Salgado's assertions that Plaintiff Garcia had "multiple jobs" and on occasion told her he was too busy to work for her suggest that Garcia did have the opportunity to earn compensation on other jobs.

Fourth, the facts presented in Defendant Salgado's letters dispute Plaintiffs' statements concerning her ability to hire and fire them. *See Mendiola*, 2021 WL 3033613, at *4 (considering defendants' "authority to hire and fire crew members" as relevant to *Lauritzen*'s first "control" factor). As discussed above, Garcia chose which projects he completed for Salgado. (First Letter at 1.) This ability to accept or decline work is the "flip side" of hiring or firing authority; Garcia

could turn down projects and terminate the work relationship of his own will. Further, Salgado's facts allude to Godinez's apparent authority to hire or fire Fierro. (Second Letter at 1 (describing Fierro as "[Godinez's] assist[a]nt or helper" with whom she "never communicated").)

Other *Lauritzen* factors do not clearly favor either party. The third factor, "the alleged employee's investment in equipment or materials required for his task," *Lauritzen*, 835 F.3d at 1535, appears to weigh slightly in Plaintiffs' favor: Salgado's letters suggest that they bought "all the material" for their home renovation work "through [her] account in Home Depot." (Third Letter at 1.) But the fourth factor, "whether the service rendered requires a special skill," *Lauritzen*, 835 F.3d at 1535, is not as clear-cut: while Plaintiffs characterize their work in renovating Salgado's properties as "menial" (Pls.' Mem. at 9), other courts have recognized that similar manual tasks may in fact require "specialized skills" developed through prior training. *See Simpkins*, 893 F.3d at 966 ("carpentry skills" for "rehab work"); *Mendiola*, 2021 WL 3033613, at *6–7 ("manual painting, spackling, and sanding"); *Jaworski*, 2013 WL 1283534, at *1, *5 ("carpentry, roofing, mechanical repair, restoration, demolition, tiling, sewer work, plumbing, and HVAC"). Here, neither party has addressed the extent of Plaintiffs' specialized training. The sixth factor— whether Plaintiffs were an "integral part of the alleged employer's business"—is also equivocal. *Lauritzen*, 835 F.2d at 1535. In general, "[i]ndividuals are more likely to be employees if they perform the primary work of the alleged employer." *Perez*, 55 F. Supp. 3d at 1078 (holding that this factor favored plaintiffs where "the business of Supermaid is providing cleaning services" and "[m]aids who work for Supermaid perform that cleaning"); *Mendiola*, 2021 WL 3033613, at *7 (reaching the same conclusion where plaintiffs performed painting jobs for commercial painting contractor). Here, the service that Plaintiffs provided to Salgado (home renovation) was important and necessary for, but distinct from, the service that she provided to her customers (realty). Without knowing more about the nature of Salgado's business, the court cannot say that this factor supports either side's position.

13

In short, "the summary judgment record presents numerous factual disputes that are material to the determination of the true economic relationship between [Plaintiffs] and [Salgado]." *Simpkins*, 893 F.3d at 967. Plaintiffs present a version of events in which they served as her de facto employees, working regularly and exclusively for her at fixed rates with little control over their schedule or tasks. Salgado presents a competing narrative in which they acted as autonomous contractors who completed discrete tasks for both her and other customers on a project-by-project basis. Because a reasonable jury could believe her story over Plaintiffs' on the record presented, judgment in Plaintiffs' favor is inappropriate at this time.

## B.      Plaintiffs' Proof of Damages

In addition to Salgado's liability, Plaintiffs seek summary judgment on the extent of their damages under the FLSA. In general, employees carry the burden to prove their FLSA damages. *Brown v. Fam. Dollar Stores of Ind., LP*, 534 F.3d 593, 594 (7th Cir. 2008) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded by statute on other grounds*, 29 U.S.C. § 254(a)). Employees can meet that burden using employment records. *Mt. Clemens*, 328 U.S. at 687. But it is the employers who are required by FLSA to "make, keep, and preserve such records of the persons employed by [them] and of the wages, hours, and other conditions and practices of [their] employment . . . ." 29 U.S.C. § 211(c). When an employer properly maintains these records pursuant to their statutory duty, an employee may simply request the documents to meet their burden. *Mt. Clemens*, 328 U.S. at 687.

There are instances where employers do not maintain employment records—as is potentially the case here. Courts do not deny employees recovery where an employer abandons this statutory duty. *Id.* Instead, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to [negate] the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 687–88. If the employer also fails to produce this evidence, courts are entitled to award approximate damages based on the employee's evidence alone. *Id.* at 688; *see also Tyson Foods, Inc. v.*

14

*Bouaphakeo,* 577 U.S. 442, 456 (2016). Plaintiffs in this case contend that Salgado bears the burden of proving their precise hours worked because she neglected to keep any time records— a fact that Salgado appears to admit in her responses. (*See* Pls.' Mot. at 10; Second Letter at 1 ("I did not have any time control machine neither . . . [b]ecause I payed them for job done.").) Because of that failure, Plaintiffs ask this court to adopt their accounting of the unpaid minimum wages and overtime they are owed. (*See* Exs. 1, 2, 3 to Godinez Aff.; Ex. 1 to Fierro Aff.)

The *Mt. Clemens* rule applies, however, only once the court finds that there was an employer-employee relationship to begin with. Here, there is a genuine dispute of material fact on that issue (and consequently, Salgado's liability under the FLSA), making their argument on damages premature. *See Callahan v. City of Chicago*, 78 F. Supp. 3d 791, 822 (N.D. Ill. 2015), *aff'd*, 813 F.3d 658 (7th Cir. 2016) ("*Anderson*'s burden-shifting standard applies . . after a plaintiff has established liability."); *cf. Perez*, 55 F. Supp. 3d at 1078–80 (reaching question of damages after affirmatively holding as a matter of law that plaintiffs were employees rather than independent contractors). If Plaintiffs are ultimately able to establish at trial that they are "employees" protected by the FLSA, the court will revisit whether Salgado's failure to keep adequate records entitles them to their calculation of damages. *See Flores v. FS Blinds, L.L.C.*, 73 F.4th 356, 366 (5th Cir. 2023) ("Should the district court conclude that Plaintiffs are employees (instead of independent contractors) and otherwise entitled to recover unpaid overtime compensation, it should then proceed to do the best [it] can in assessing damages . . . under *Mt. Clemens*." (citations and internal quotation marks omitted)). For now, the court denies summary judgment on Plaintiffs' counts under the FLSA as to both liability and damages.

## III.    The Illinois Minimum Wage Act

That leaves only Plaintiffs' motion for summary judgment on their IMWL claims. The IMWL creates parallel minimum-wage protections to the federal FLSA's for Illinois workers, and "courts have generally interpreted their provisions to be coextensive, and . . . have generally applied the same analysis to both." *Callahan*, 78 F. Supp. 3d at 821–22; *see* 820 ILCS 105/3(c), (d), 105/4,

105/4a; *see also* Ill. Admin Code tit. 56, §§ 210.110, .120 (stating that the IMWL should be interpreted in accordance with FLSA regulations and setting forth a similar six-factor test to *Lauritzen*'s for determining "employee" status). Since Plaintiffs have failed, as yet, to establish that they must be found to be employees under the FLSA, their motion for summary judgment on their IMWL claims also fails. *Jaworski*, 2013 WL 1283534, at *7.

## CONCLUSION

Plaintiffs' motion for summary judgment [50] is denied as to all counts. Plaintiffs' request for leave to file a separate petition for attorneys' fees and costs is denied without prejudice.

ENTER:

Dated: July 16, 2024

_____
REBECCA R. PALLMEYER
United States District Judge